J-A20021-22
J-A20022-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: N.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 994 EDA 2022 |

Appeal from the Order Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0000019-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: L.A.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 995 EDA 2022 |

Appeal from the Decree Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000002-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: L.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1095 EDA 2022 |

Appeal from the Order Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0000019-2020

| IN THE INTEREST OF: L.A.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
|  | : |  |
|  | : |  |
|  | : |  |
| APPEAL OF: S.F., FATHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 1096 EDA 2022 |

Appeal from the Decree Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No:  CP-51-AP-0000002-2022

BEFORE:   BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.:                **FILED OCTOBER 12, 2022**

N.R. ("Mother") and S.F. ("Father") (collectively, "Parents") appeal from the decrees entered on March 29, 2022, in the Court of Common Pleas of Philadelphia County, involuntarily terminating their parental rights to their son, L.F. ("Child"), born in December of 2019, and the order changing Child's permanency goal from reunification to adoption.[1]  We affirm the decrees and dismiss the appeals from the goal change order as moot.

On January 6, 2020, when Child was less than two weeks old, the trial court placed him in the protective custody of the Philadelphia Department of Human Services ("DHS") due to concerns regarding Parents' mental health,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Parents raise similar issues for our consideration, which arise from the same set of facts.  In addition, Parents live together, and their conduct is intermingled.  Thus, we review their appeals together.

drug and alcohol abuse, and housing. N.T., 3/29/22, at 8. In addition, the court placed Child in the custody of DHS because Parents were under investigation for the death in October of 2018, of their six-month-old child.[2] Trial Court Opinion, 5/4/22, at 1. The trial court placed Child in shelter care on January 8, 2020, and permitted him to reside with his paternal great-aunt. DHS soon approved this home as Child's kinship placement.

On August 7, 2020, following a hearing, the court adjudicated Child dependent. Child's placement goal was reunification, and Mother and Father were required to participate in the following single case plan ("SCP") objectives: a mental health evaluation at Behavioral Health Services ("BHS"); drug screening at the Clinical Evaluation Unit ("CEU"); programs for parenting, housing, and employment at the Achieving Reunification Center ("ARC"); a parenting capacity evaluation; and weekly supervised, line of sight/line of hearing visits with Child. Trial Court Opinions, 5/4/22 & 5/10/22, at 2.

Permanency review hearings occurred at regular intervals. By the last hearing in October of 2021, the only permanency objective Parents had completed was parenting classes. They failed to consistently participate in

_____

[2] There is limited evidence in the certified record regarding the death of Parents' older child and the resulting investigation of Parents. However, at the conclusion of the testimonial evidence, the Honorable Daine Grey, Jr., who presided over all of the proceedings in the underlying matter, stated on the record in open court that no criminal charges were filed against Parents for the death of their other child. N.T., 3/29/22, at 94.

supervised visitation with Child. In addition, the Community Umbrella Agency ("CUA") deemed Parents' housing inappropriate, describing it as "a rooming house." N.T., 3/29/22, at 10. Although they had their own apartment with a kitchen, Parents shared a bathroom with other tenants who lived in the facility, and the CUA was unable to obtain criminal clearances or otherwise assess the safety of the tenants. *Id.* at 21-24, 33.

On January 3, 2022, nearly two years after Child's placement, DHS filed a petition to change Child's permanency goal to adoption, and a separate petition on the adoption docket for the involuntary termination of Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

The evidentiary hearing on the petitions occurred on March 29, 2022,[3] during which DHS presented the testimony of Kimberly Walker, the case manager at the CUA; and William Russell, Ph.D., who, by separate parenting capacity evaluations ("PCE") dated December 30 and 31, 2021, opined that Parents were then incapable of providing safety to Child due to their failure to comply with their permanency objectives, including, but not limited to, obtaining safe housing. PCE, 12/30/2021, at 11; PCE, 12/31/2021, at 10. Mother and Father testified on their own behalf. On March 29, 2022, the court

---

[3] At the time of the subject proceeding, Child was two years old. He was represented by separate legal and best interests counsel.

entered the subject goal change order and involuntary termination decrees on the respective dockets.

On April 4, 2022, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Mother filed an amended notice of appeal on April 30, 2022, on the dependency docket only, for the purpose of correcting a clerical error. The trial court filed a Rule 1925(a) opinion on May 4, 2022. This Court subsequently consolidated Mother's appeals *sua sponte*.

Mother's questions are as follows.

1.    Did the evidence presented by DHS satisfy the standard of clear and convincing?

2.    Did the [trial c]ourt err in granting [a] goal change from reunification to adoption?

3.    Did the [trial c]ourt err in terminating Mother's parental rights?

4.    Did the [trial c]ourt place inappropriate weight on the report and testimony of William H. Russell, Ph.D.?

5.    Did the [trial c]ourt abused its discretion in finding that the goal change and termination of parental rights are best suited to the protection and physical, mental and moral welfare of [C]hild?

Mother's Brief at 7-8.

Father timely filed notices of appeal and concise statements of errors complained of on appeal on April 27, 2022, which this Court consolidated *sua sponte*. The trial court filed a Rule 1925(a) opinion on May 10, 2022.

Father's questions are as follows.

- 5 -

1.      Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa.C.S. [§] 2511(a)(1) without clear and convincing evidence of an intent to relinquish his parental claim or refusal to perform his parental duties.

2.      Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa.C.S. [§] 2511(a)(2) without clear and convincing evidence of his present incapacity to perform parental duties.

3.      Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa.C.S. [§] 2511(a)(5) and (8) without clear and convincing evidence to prove that [DHS] made reasonable efforts to provide [F]ather with additional services and that the conditions that led to placement of [C]hild continue to exist.

4.      Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa.C.S. [§] 2511(b) without clear and convincing evidence that no parental bond exists between [F]ather and [C]hild and that termination would serve the best interest of [C]hild.

5.      Whether the trial court erred by changing the permanency goal to adoption pursuant to 42 Pa.C.S. [§] 6351 without clear and convincing evidence that adoption is in [C]hild's best interest.

6.      Whether the trial court erred by changing the permanency goal to adoption pursuant to 42 Pa.C.S. [§] 6351 without clear and convincing evidence that reasonable efforts were made by the servicing agency to reunify [C]hild with [F]ather.

7.      Whether the trial court erred by changing the permanency goal to adoption in contravention of the mandate of 42 Pa.C.S. [§] 6302 to preserve the unity of the family whenever possible.

Father's Brief at 8.

We first review Parents' issues regarding the involuntary termination decrees, which are interrelated, so we review them together. "In cases concerning the involuntary termination of parental rights, appellate review is

limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences

for both the parent and child." ***L.A.K.***, 265 A.3d at 591.  As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***C.M.***, 255 A.3d at 359 (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act.  "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination."  ***C.M.***, ***supra***; ***see also*** 23 Pa.C.S.A. § 2511(a)(1)-(11).  In evaluating whether the petitioner proved grounds under Section 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." ***Interest of L.W.***, 267 A.3d 517, 524 n.6 (Pa. Super. 2021).  If the trial court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must assess the petition under Section 2511(b), which focuses on the child's needs and welfare.  ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

Instantly, we analyze the involuntary termination decrees pursuant to Section 2511(a)(8) and (b):[4]

---

[4] This Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights.  ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).
*(Footnote Continued Next Page)*

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

To satisfy Section 2511(a)(8), the petitioner must prove: (1) that the child has been removed from the care of the parent for at least 12 months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. ***In re Adoption of J.N.M.***, 177 A.3d 937, 943 (Pa. Super. 2018).

---

Therefore, we need not review Mother's and Father's issues with respect to Section 2511(a)(1), (2), and (5).

- 9 -

Unlike other subsections, Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). "[T]he relevant inquiry" regarding the second prong of Section 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the Section 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

This Court has recognized "that the application of [Section 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [18] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id.*

- 10 -

Finally, this Court has explained:

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

With respect to Section 2511(b), the court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The "emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and quotation marks omitted). Our Supreme Court has made clear that Section 2511(b) requires the trial court to consider the nature and status of bond between a parent and child. *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). Existence of a bond does not necessarily result in denial of a termination petition. *T.S.M.*, 71 A.3d at 267. Instead, the court must examine the effect on the child of severing such bond. *Id.* "When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'" *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2017) (quoting *E.M.*, *supra*, at 484-485).

"While a parent's emotional bond with his or parent is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of

many factors to be considered by the court when determining what is in the best interest of the child." ***In re M.M.***, 106 A.3d 114, 118 (Pa. Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." ***Id.***

In their appeals, Mother and Father argue that DHS did not prove by clear and convincing evidence that their conduct warrants termination under Section 2511(a)(8). Specifically, Mother asserts that she "has begun regular employment with medical benefits and Father has obtained better employment, thereby providing additional funds to obtain better housing." Mother's Brief at 32. Mother's argument is unavailing.

Mother testified that she has full-time employment with medical benefits. N.T., 3/29/22, at 85. Mother did not testify when her employment commenced or in what occupation she is employed. Father testified that Mother "started working last week at U-Haul. [S]he'll be getting her first paycheck on April . . . 7th." ***Id.*** at 73-74. Father testified on direct examination that, to his knowledge, Mother's employment offers medical benefits. ***Id.*** at 75. Ms. Walker, the CUA case manager, confirmed that Mother told her "she just found a job last week." ***Id.*** at 22. However, Ms. Walker testified that Mother has not provided verification of her employment. ***Id.*** Father testified that he has been working as a cook at a restaurant in

Horsham, Pennsylvania, since September of 2021. *Id.* at 73. Like Mother, Ms. Walker testified Father has failed to provide verification of employment despite her requesting it throughout the case. *Id.* at 19.

Mother asserts in her brief that she and Father will have additional funds to obtain better housing due to their employment. Father testified that he is looking for housing in Horsham, near his workplace. *Id.* at 72-73. Nevertheless, Ms. Walker, who inspected Parents' "rooming house," testified that she referred Parents to ARC to find suitable housing, but they were unwilling to move. *Id.* at 11, 23-24, 33. She testified that Father "thought his home was appropriate." *Id.* at 11. In addition, Ms. Walker explained that Parents have not qualified for housing assistance from DHS because they have other outstanding permanency objectives. *Id.* at 31.

Parents' willingness to find new housing comes too late. The trial court was not required to consider it. *In re M.A.B.*, 166 A.3d at 446. Further, assuming *arguendo* that Mother became employed the week prior to the hearing, the Act expressly prohibited the court from considering it. *See* 23 Pa.C.S.A. § 2511(b) ("any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition."). Rather, the court was required to consider whether reunification of Parents with Child was imminent at the time of the hearing, and it was not due to outstanding permanency objectives, as follows. *In re I.J.*, 972 A.2d at 11.

The trial court emphasized that Parents failed to consistently visit with Child. Trial Court Opinion, 5/4/22, at 10; Trial Court Opinion, 5/10/22 at 12. Ms. Walker testified that, in the last nine months, Mother was offered forty-three visits. She attended fifteen. N.T., 3/29/22, at 22. Father attended two out of the forty-three visits offered in the last nine months. *Id.* at 11. On this basis alone, Ms. Walker testified that CUA was unable to conclude that Parents could safely reunify with Child. *Id.* at 12, 23.

Regarding Parents' permanency objectives to attend random drug screens, Ms. Walker testified that, over the duration of Child's dependency, Mother attended drug testing at the CEU three times, all of which were negative. *Id.* at 24. However, Ms. Walker requested Mother attend three drug tests every three months, but she attended no others, including, but not limited to, in the three months prior to the subject proceeding. *Id.* at 24-25.

Likewise, Ms. Walker requested Father attend three drug tests at the CEU every three months, but he attended a total of only three by the time of the subject proceeding. *Id.* at 14-15. However, Father asserts that Ms. Walker had no personal knowledge of this, "nor documentation from CEU, nor did she seek to obtain any documentation from CEU. . . . The presentation of undocumented hearsay testimony does not satisfy the clear and convincing standard." Father's brief at 16.

Father fails to provide discussion with citation to relevant authority or to develop his claim in any other meaningful fashion. *Id.* As such, we

conclude that his claim is waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-466 (Pa. Super. 2017) (citation omitted) (reiterating that a claim is waived where an appellate brief fails to provide any discussion of the claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review).

Even if not waived, we would conclude that Father's claim fails. It is well-settled that "decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party." *Phillips v. Lock*, 86 A.3d 906, 920 (Pa. Super. 2014) (citation omitted).

The Pennsylvania Rules of Evidence define hearsay as a statement that:

(1) the declarant does not make while testifying at the current trial or hearing; and

(2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Pa.R.E. 801(c).

This Court has explained:

As a general rule, hearsay is inadmissible, because such evidence lacks guarantees of trustworthiness fundamental to our system of jurisprudence. The rule against admitting hearsay evidence stems from its presumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement. Notably, it is elemental that, [a]n out of court statement which is not offered for its truth, but to explain the witness' course of conduct is not hearsay.

*In re K.A.T.*, 69 A.3d 691, 702 (Pa. Super. 2013).

Ms. Walker's testimony on direct examination is as follows.

Q. And with respect to [F]ather, have you called him for random drug screens throughout this case?

A. Yes.

Q. Have you called him for the court[-]ordered three every listing?

A. Yes.

Q. Has [F]ather gone consistently for random drug screens?

A. No.

Q. Throughout the life of the case, how many random drugs screens did he go for, if you know?

[FATHER'S COUNSEL]: Your Honor, I'm going to object as hearsay, unless she has personal knowledge.

THE COURT: Overruled. I don't believe it would be hearsay. In the course of her job as the case manager, she would have knowledge of whether he went to drug screens. Overruled.

. . .

A. Three.

Q. Three throughout the case?

A. Three. He tested positive for marijuana in one of them.

[FATHER'S COUNSEL]: Objection; hearsay.

A. And in two of them, he couldn't give a sample.

THE COURT: Overruled. How do you know?

- 16 -

A.      Because I contacted CEU and they informed me.

[FATHER'S COUNSEL]: Objection.

THE COURT: That objection is sustained.

[FATHER'S COUNSEL]: I move to strike all the information regarding —

THE COURT: It's stricken.  It's stricken.

*Id.* at 15.   Because the trial court agreed with Father's counsel that Ms. Walker's testimony in this regard was inadmissible hearsay and did strike it from the evidence, Father's claim is without merit.

However, DHS introduced into evidence, and the court admitted over the objection of Father's counsel, a CEU report dated January 9, 2020, revealing that Father tested positive for marijuana.[5]  N.T., 3/29/22, at 17-19;

---

[5] Ms. Walker authenticated the document as follows.

Q. Ms. Walker, could you identify what [DHS-2] is?
A. This is the CEU drug test report.
Q. And . . . did you receive that from the CEU?
A. Yes, I did.
                                    . . .

Q. And is that what you sent [F]ather for?
A. Yes.
                                    . . .

THE COURT: And is that something you usually see in the [course] of your work — is that part of your work records?

A. Yes.

*(Footnote Continued Next Page)*

DHS Exhibit 2. Father neither references nor challenges the admissibility of DHS Exhibit 2 in his brief. As such, competent record evidence demonstrates that Father tested positive for marijuana in one CEU drug screen.

Further, trial court found that Father "did not engage in his court-ordered drug treatment." Trial Court Opinion, 5/10/22, at 12 (citation to record omitted). The record evidence likewise supports this finding. By permanency review order in October of 2021, the court directed Father to attend drug treatment. N.T., 3/29/22, at 12-13. Ms. Walker testified that she discussed drug treatment with Father in December of 2021, and together they called the Wedge to schedule his intake appointment. *Id.* at 13. However,

_____

> THE COURT: [DHS counsel], do you have any other questions? You want to mark and move it.
>
> [DHS COUNSEL]: I'd mark it as DHS —
> THE COURT: Is there any objection?
>
> [FATHER'S COUNSEL]: There's still an objection, Your Honor.
>
> THE COURT: Grounds?
>
> [FATHER'S COUNSEL]: She's not the proper person to be authenticating this document. Someone from CEU would have to authenticate it as being one of their documents.
>
> THE COURT: It's a work document. I'll overrule that objection. We're going to mark and move DHS-2 into evidence.

*Id.* at 17-19.

Father told Ms. Walker that he did not attend the appointment. *Id.* Ms. Walker testified that Father told her "he only smokes marijuana — that he has a marijuana card. He said he had a marijuana card so there was no reason for him to go to drug treatment." *Id.* at 14. Nonetheless, Father failed to provide Ms. Walker with a marijuana card. *Id.* Ms. Walker testified that the CUA is still concerned about drug and alcohol abuse by Father. *Id.* at 19. To the extent Father claims that the trial court abused its discretion in crediting Ms. Walker's testimony in this regard, we do not disturb the court's finding. *See Interest of S.K.L.R.*, 256 A.3d at 1123 (reiterating that the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record).

Lastly, Mother and Father completed an evaluation with BHS, but Ms. Walker testified that neither participated in therapy that BHS offered. *Id.* at 20, 25. It is important to note that Dr. Russell recommended that Parents participate in individual therapy. Specifically, Dr. Russell recommended therapy for Father for the purpose of developing "an accurate understanding of his role and responsibility for his current situation." PCE, 12/30/21, at 11. Dr. Russell recommended therapy for Mother due to her Minnesota Multiphasic

Personality Inventory-2-RF ("MMPI-2-RF") testing revealing, in part, that she suffered from "psychological distress."[6] PCE, 12/31/21, at 8, 11.

However, Mother asserts that the trial court placed inappropriate weight on Dr. Russell's opinion and testimony. First, she claims that the PCE, dated December 31, 2021, "was stale" because he interviewed her in October 2021, and, therefore, the evaluation "did not take into account [her] progress as to employment and visitation." Mother's Brief at 33. We disagree.

In the PCE's, Dr. Russell stated that, by permanency review order dated February 16, 2021, the court referred Parents for the evaluation. Nonetheless, Mother fails to support her claim that her PCE "was stale" because she does not point to a place in the record, nor does our review reveal one, establishing the date Dr. Russell interviewed her. Pa.R.A.P. 2119(c) (Reference to record). Further, the PCE's are dated December 30 and 31, 2021, which was several days before DHS filed the subject petitions. Therefore, the PCE's were not untimely.

Even if untimely, Mother's claim fails. As discussed above, (1) the Act prohibited the trial court from considering that she obtained employment one week before the subject proceeding and (2) there is no

---

[6] In addition, Dr. Russell recommended that Mother obtain and maintain appropriate housing and employment and follow all permanency plan objectives. If she does so, and if Father is in full compliance with his permanency plan objectives, Dr. Russell stated, "visitation should be expanded." PCE, 12/31/21, at 11.

- 20 -

record evidence that she progressed after Dr. Russell's interview by consistently attending supervised visitation. For these reasons, we would reject Mother's assertion that the court erred in considering Dr. Russell's opinion even if untimely.

Second, Mother asserts that Dr. Russell's report was based on inadmissible hearsay. Specifically, Mother asserts:

> Dr. Russell characterized the residence as a "rooming house" based on the descriptions by CUA and [P]arents. He never visited the premises. Dr. Russell emphasized Father's failure to generate documentation as to employment. Again, the single case plans as to both parents call for employment, not documentation. For example, a day laborer, a person who cleans houses, or a free lancer [sic] could be paid cash and not received documentation.

> Dr. Russell's testimony was based largely on records and interviews with [P]arents. Much of his report was based on hearsay. The [c]ourt erred by adopting Dr. Russell's flimsy observations.

Mother's brief at 33-34. Mother is not entitled to relief.

With respect to Dr. Russell characterizing Parents' home as a "rooming house," Mother's assertion that it is hearsay fails because she acknowledges that Parents themselves provided the information that informed his finding in this regard. We also reject Mother's assertion that Dr. Russell's finding was inaccurate that Father did not provide documentation concerning his employment documentation to CUA. Mother simply argues that Father was not required to provide documentation and/or never received documentation due to the nature of his work. Mother's argument is flawed and based on speculation. Indeed, Father testified, "[at the l]ast court date, I did provide

. . . copies of my pay stubs of where I work at." N.T., 3/29/22, at 73. Therefore, Father had the documentation and was aware of the requirement to provide it.

We reject Mother's overall assertion that the court abused its discretion in considering Dr. Russell's evaluation and testimony because it was based on inadmissible hearsay. Dr. Russell testified, "the recommendations that were made both in the service plan as well as my evaluation were critical to developing the ability or the methods for keeping the child safe." *Id.* at 60. Because Mother had failed to comply with her permanency objectives as well as Dr. Russell's recommendations, he opined that Mother was not then able to provide safety for Child. *Id.* Dr. Russell based his findings on his interview with Mother and the results of her MMPI-2-RF testing, neither of which constituted hearsay. As such, we discern no abuse of discretion by the trial court in determining that reunification between Mother and Child was not imminent at the time the subject proceeding.

In addition, the record supports termination under the third element of Section 2511(a)(8), that it would best serve Child's needs and welfare. Ms. Walker testified Child has displayed no signs of significant harm from Parents not visiting him consistently. N.T., 3/29/22, at 26-27. Ms. Walker testified Child would not be harmed if Mother's and Father's parental rights are terminated. *Id.* Rather, she explained it would harm Child if he were removed from his pre-adoptive kinship home, where he has lived his entire life, and

where he enjoys a parent-child bond. *Id.* at 27-28. Thus, because the trial court did not abuse its discretion under Section 2511(a)(8), Parents' arguments fail.

With respect to Section 2511(b), Mother lodges a singular argument, that is, "The characterization of [her home being] a 'rooming house' was unsupported by the evidence." Mother's brief at 32. Ms. Walker's testimony described above belies her claim, and so Mother is not entitled to relief.

Father argues that he and Child "have a strong emotional bond." Father's Brief at 17. Specifically, Father states that he

> dressed and diapered [Child], fed him, bathed him and nursed him back to health when he was ill. An undisputed and unbreakable bond between [F]ather and [C]hild was formed during this formative period that was crucial to [C]hild's development and well-being. Father continued to strengthen the bond with his child until the removal by DHS. . . .

*Id.* at 17. His claims are meritless inasmuch as (1) Child was removed from Parents when he was less than two weeks old; (2) there is no testimony that Child was ill during the short time that he lived with Parents; and (3) DHS disputes that a parental bond could have formed with Father in less than two weeks. The only evidence on this record of a parent-child bond is between the kinship mother and Child. N.T., 3/29/22, at 27-28. Thus, Father also is not entitled to relief under Section 2511(b).

Parents' remaining issues concern the permanency order that changed Child's goal from reunification to adoption. Given our disposition of Mother's and Father's appeals from the involuntary termination decrees, their appeals

from the goal change order are moot. ***See In re D.A.***, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect."). As such, we dismiss them.

Decrees affirmed. Appeals from goal change order dismissed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/12/2022